1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10
11  FRANK MILLETTE,                          )   1:07-CV-00119 GSA HC
                                            )
12            Petitioner,                    )   ORDER DENYING PETITION FOR WRIT
                                            )   OF HABEAS CORPUS
13       v.                                  )
                                            )   ORDER DIRECTING CLERK OF COURT
14  ADAMS,                                   )   TO ENTER JUDGMENT FOR
                                            )   RESPONDENT
15            Respondent.                    )
                                            )   ORDER DECLINING ISSUANCE OF
16  _____ )   CERTIFICATE OF APPEALABILITY

17
18      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19  pursuant to 28 U.S.C. § 2254. The parties having voluntarily consented to exercise of Magistrate

20  Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1), by order dated August 14, 2007, this case was

    assigned to the Magistrate Judge for all purposes, including entry of final judgment.
21
22                                    **BACKGROUND**

23      Petitioner is currently in the custody of the California Department of Corrections pursuant

24  to a judgment of the Superior Court of California, County of Tulare, following his conviction on July 1,

25  2004, by jury trial of first degree attempted murder (Cal. Penal Code §§ 664, 187(a)), first degree

26  burglary (Cal. Penal Code § 459), with findings that he had personally inflicted great bodily injury

27  (Cal. Penal Code § 12022.7) and had served a prior prison term (Cal. Penal Code § 667.5(b)). (LD

28

1    A-D[1].)  Petitioner was sentenced to serve an indeterminate term of life with the possibility of parole

2    plus four years. (LD D.) Sentencing was stayed as to the burglary conviction. (LD D.)

3           Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

4    (hereinafter "Fifth DCA"). On December 28, 2005, the Fifth DCA affirmed the judgment. (LD D.)

5    Petitioner then filed a petition for review in the California Supreme Court. (LD E.) The California

6    Supreme Court summarily denied the petition on March 15, 2006. (LD F.)

7           On January 22, 2007, Petitioner filed the instant federal petition for writ of habeas corpus in

8    this Court. Petitioner presents the following grounds for relief: 1) He contends his conviction for

9    premeditated attempted murder must be reversed because it is not supported by substantial evidence;

10   2) He claims the victim's treating physician offered an improper opinion regarding the nature of the

11   victim's injury, and his defense counsel was ineffective in failing to object to the evidence; and 3)

12   He argues his ex-wife improperly volunteered highly prejudicial information that Petitioner was "in

13   and out of jail all the time," and his trial counsel was ineffective in failing to object to such

14   inadmissible character evidence. On June 27, 2007, Respondent filed an answer to the petition.

15   Petitioner filed a traverse on August 27, 2007.

16                                    **FACTUAL BACKGROUND**[2]

17          On May 22, 2003, Denise Meler, Petitioner's ex-wife, and Kenneth Meeks, Meler's current

18   boyfriend were together at Meler's trailer home in Pixley.[3] Around 11:00 p.m., Kim Seaton, Meler's

19   best friend, and another woman, "Maria," came over to visit. The two women stayed about an hour

20   to an hour and a half and then left. As they were leaving, Meler went to join Meeks, who had already

21   gone to bed.

22          After she got into bed, Meler heard a knock on her bedroom window and then Seaton

23   announced from the front door that Cyndi Grable, Meler's cousin, was coming into the trailer.

24   _____

25          [1]"LD" refers to the documents lodged by Respondent with his answer.

26          [2]The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of December 28, 2005,
     and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). (LD D at pp. 2-5.)

27
            [3]Meeks and Meler both admitted to having used methamphetamine the morning of the incident and having suffered
28   prior felony convictions in California and in Oregon.

1   Grable and another woman, "Sandy," walked into Meler's bedroom. Grable had a brief conversation

2   with Meler. During this time, Grable gave Meeks "dirty looks." Grable and Sandy stayed five or six

3   minutes and then left.

4          Shortly after Grable and Sandy left the bedroom, Petitioner entered the room and approached

5   Meeks' side of the bed. Meler jumped out of bed and stood up. Petitioner moved to about four inches

6   from Meeks' face and said, "so you like to beat up on women, or something like that." Meeks

7   replied, "it is like that, huh?" Petitioner asked Meeks if he wanted to go outside and talk about it.

8   Meeks responded, "let me get my shoes on. We can do this." Petitioner stepped back, pulled a knife

9   from his back pocket, and slit Meeks' throat from one side to the other. Petitioner then ran from the

10  room.

11         Meeks grabbed his neck and bent his head down to stop the bleeding and fell back towards

12  the bed. When Meler saw the blood, she "freaked" and ran screaming after Petitioner. Petitioner got

13  into a car with Grable and Sandy. The car drove away quickly. Because there was no telephone in the

14  trailer, Meler drove Meeks to the Pixley Fire Department. From there, an ambulance transported

15  Meeks to the Tulare Hospital, where he was treated by Dr. Douglas Malcolm, the emergency room

16  director.

17         Dr. Malcolm sutured the laceration across Meeks' neck. According to Dr. Malcolm, when he

18  first saw Meeks' neck, it was "filleted apart, almost like a jumbo butterfly shrimp, filleted, except

19  that it was eight inches long or so." The cut was a life-threatening injury and the doctor believed it

20  would have been fatal to a thinner person. Meeks' obesity and the thickness of his neck helped save

21  his life. The knife or object which cut Meeks' neck stopped just short of the muscle covering the

22  jugular veins and carotid arteries.

23         Meeks' injury was similar to other injuries Dr. Malcolm had treated in the past. Dr. Malcolm

24  twice described the injury as the type seen in an "execution-style slaying." Dr. Malcolm testified

25  Meeks' injury was "about as extensive as I have seen, where someone has come in and has been

26  alive." Dr. Malcolm estimated he had seen 150 to 250 cases of knife-wound injuries during his 15-

27  year career as an emergency room specialist.

28         After Meeks' injury was treated, he was sent back to Meeks' trailer in a sheriff's vehicle. It

1  was still dark when the police left. Meler went to sleep. Anticipating Petitioner would return, Meeks

2  stayed up and armed himself with a .22-caliber rifle. Around 7:30 a.m., there was a knock on the

3  bedroom window. Meeks pulled the curtain back with the barrel of the gun and saw Grable standing

4  there. Meeks then saw a car parked approximately 50 feet from the trailer. Meeks noticed Sandy was

5  driving and Petitioner was in the backseat. It looked like Petitioner had something in his hand.

6  Meeks later told police Petitioner appeared to be pointing something, possibly a gun, towards the

7  bedroom window. Meeks knelt down and shot at Petitioner through the bedroom window. The car

8  then drove off.

9  **Defense**

10    Petitioner denied that he committed the charged offenses. Petitioner claimed he was home all

11  night and never went to Meler's trailer on May 22 or May 23, 2003. Petitioner had no problems with

12  Meler and did not know where she lived at the time of the offenses.  Petitioner had never met Meeks

13  before and had no problems with him either. Petitioner admitted he had suffered prior felony

14  convictions in California and Oregon.

15    Petitioner's friends Brian Smith and Trina Menges testified they saw Petitioner on the night

16  of May 22, 2003, and that he appeared to be happy and in a good mood. Smith saw Petitioner around

17  9:30 or 9:40 p.m. Petitioner was in his garage painting flames on the tank of his brother's Harley

18  motorcycle. Petitioner and Smith planned for Smith to come over in the morning to drive Petitioner

19  to the Department of Motor Vehicles (DMV) to get an identification card. The next morning they

20  met around 9:30 or 10:00 a.m. to go to the DMV. Petitioner still appeared to be happy and showed

21  no signs of stress, fear, or worry. Menges saw Petitioner around 11:00 p.m. on May 22, 2003. She

22  went to take him dinner and stayed about 20 minutes. During this time, they were laughing and

23  joking. Petitioner did not appear to be stressed, worried, or angry.

24  **Rebuttal**

25    Kim Seaton testified that on the evening of May 22, 2003, she saw Grable and another

26  woman come into Meler's trailer as she was leaving. Shortly thereafter, Seaton saw Petitioner

27  standing by the corner of the trailer, next to Meler's bedroom window. Petitioner signaled Seaton by

28  moving his finger in a hooking fashion. At trial, Seaton testified she was unable to recall what

Petitioner said to her but acknowledged she previously told Detective Melody Flores that Petitioner said, "I want you to help lure him out." In response to what Petitioner said, Seaton answered, "no way. I don't want any part of this . . . [s]hit," got in her van, locked the door , and drove away.

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

1   States" or "resulted in a decision that was based on an unreasonable determination of the facts in

2   light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

3   538 U.S. at 70-71; see Williams, 529 U.S. at 413.

4        As a threshold matter, this Court must "first decide what constitutes 'clearly established

5   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

6   quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

7   must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

8   of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly

9   established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

10  the Supreme Court at the time the state court renders its decision." Id.

11       Finally, this Court must consider whether the state court's decision was "contrary to, or

12  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

13  quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

14  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

15  question of law or if the state court decides a case differently than [the] Court has on a set of

16  materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

17  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

18  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

19  applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

20       "[A] federal court may not issue the writ simply because the court concludes in its

21  independent judgment that the relevant state court decision applied clearly established federal law

22  erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

23  federal habeas court making the "unreasonable application" inquiry should ask whether the state

24  court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

25       Petitioner has the burden of establishing that the decision of the state court is contrary to or

26  involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

27  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

28  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

1   decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

2   Cir.1999).

3          AEDPA requires that we give considerable deference to state court decisions. The state

4   court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

5   interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537

6   U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

7   **III.  Review of Petition**

8          **A.  Ground One**

9          In his first claim for relief, Petitioner alleges there was insufficient evidence to support the

10   conviction for attempted first degree murder. He argues there was insufficient evidence to show he

11   acted with the required specific intent to kill.

12          1.  Review of Claim by State Courts

13          The claim was first presented on direct appeal to the Fifth DCA.  On December 28, 2005, the

14   Fifth DCA denied the claim in a reasoned opinion. (LD D at pp. 5-8.) Petitioner then filed a petition

15   for review in the California Supreme Court. (LD E.) The petition was denied on March 15, 2006.

16   (LD F.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's

17   decision, is presumed to have denied the claims presented for the same reasons stated in the opinion

18   of the Fifth DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

19          In analyzing this claim, the appellate court first set forth the elements of attempted first

20   degree murder:

21              Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.
             [Citation.] To prove attempted murder, there must be sufficient evidence of the intent to
22              commit the murder plus a direct but ineffectual act toward its commission. [Citation.] "The
             mental state required for attempted murder has long differed from that required for murder
23              itself. Murder does not require the intent to kill. Implied malice - a conscious disregard for
             life - suffices." [Citation.] In contrast, implied malice cannot support a conviction of an
24              attempt to commit murder, and a specific intent to kill is a requisite element of attempted
             murder. [Citation.] Because there is rarely direct evidence of a defendant's intent, this intent
25              "must usually be derived from all the circumstances of the attempt . . . ."  [Citation.]

26              In California, there are three types of evidence generally relied upon to support a
             finding of premeditation and deliberation:

27
28              (1) facts about how and what [the] defendant did prior to the actual killing
                 which show that the defendant was engaged in activity directed toward, and

explicable as intended to result in, the killing - - what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed"; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing as so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2)."  [Citation.]

"Evidence concerning motive, planning, and the manner of killing are pertinent to the determination of premeditation and deliberation, but these factors are not exclusive nor are they invariably determinative."

. . .

A reviewing court may not substitute its judgment for that of the jury and must view the record favorably to the judgment below to determine whether there is evidence to support the judgment. The function of the appellate court is not to "scour the record in search of evidence suggesting a contrary view." [Citation.]

(LD D at pp. 6-7.)

The appellate court then rejected the claim as follows:

In this case, sufficient evidence of premeditation and deliberation exists to support [Petitioner's] conviction for attempted first degree murder. [Petitioner] went to his ex-wife's trailer late at night and waited outside while Grable and Sandy paid a brief visit to Meler. When Seaton spotted [Petitioner] lurking outside the trailer, [Petitioner] sought her aid to help "lure" Meeks outside. Shortly after Grable and Sandy left the trailer, [Petitioner] entered Meler's bedroom and confronted Meeks. The foregoing circumstances are indicative of planning. When [Petitioner] approached Meeks, who was in bed with [Petitioner's] ex-wife, he accused Meeks of a penchant for beating women, raising an issue of motive on [Petitioner's] part. [Petitioner] then stood in close range of Meeks and invited him to "talk" outside, simultaneously assuring better accuracy for his aim and rendering Meeks vulnerable by allaying any suspicion that [Petitioner] was about to attack him. Right after Meeks agreed to go outside after he put his shoes on, [Petitioner] produced a knife from his back pocket and slit Meeks' throat. Meeks suffered an eight-inch laceration to his neck. This serious injury would likely have been fatal but for Meeks' corpulent physique. If [Petitioner] had merely wanted to hurt Meeks, he could have cut him in a less vulnerable area. Moreover, immediately after [Petitioner] slit Meeks' throat, [Petitioner] jumped into a vehicle with Grable and Sandy and fled. [Petitioner] demonstrated consciousness of guilt by his flight. [Citation.]

On appeal, [Petitioner] claims the brutality of his attack on Meeks and the severity of the resulting injury by themselves do not constitute sufficient circumstantial evidence he specifically intended to kill Meeks, and he points to Meeks' testimony that [Petitioner] did not say a word or make any threats to kill Meeks when he cut Meeks' throat. We find [Petitioner's] claim unpersuasive. As the court noted in *People v. Anderson* [Citation], "directly plunging a lethal weapon into the chest evidences a deliberate intention to kill as opposed to . . . 'indiscriminate' multiple attacks of both severe and superficial wounds . . . ." The same holds true here. Directly slitting the victim's throat with a knife and inflicting an

eight-inch laceration which would have been fatal to the average person evidences a deliberate intention to kill in this case. Based on the nature of the attack, and the other circumstances discussed above, we conclude the jury had before it substantial evidence from which it could find [Petitioner] intended to mortally wound Meeks and that he acted with premeditation and deliberation. Accordingly, we reject [Petitioner's] challenges based on the asserted insufficiency of evidence to support his conviction for attempted first degree murder.

(LD D at pp. 7-8.)

### 2.  Analysis of Claim

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979).  See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).  Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597 (1981).

In this case, the state court correctly determined there was sufficient evidence such that a rational trier of fact could have found the elements of premeditation and deliberation beyond a reasonable doubt, and there was sufficient evidence supporting the conclusion that Petitioner had the specific intent to kill. As fully discussed by the appellate court, Petitioner went to the victim's trailer late at night and waited while his ex-wife's friends went inside. While waiting outside, he spotted Kim Seaton and attempted to enlist her help in luring the victim outside. When she refused, he went inside. The victim was lying in bed next to Petitioner's ex-wife. Petitioner approached the victim and

1  accused him of beating women. He then invited the victim to talk outside. The victim then sat up and

2  stated he needed to put his shoes on. At this point, Petitioner took out a knife and sliced the victim's

3  neck. The victim fell back into bed clutching his bleeding throat. Petitioner immediately left. These

4  facts clearly show premeditation and deliberation on the part of Petitioner.

5      In addition, Petitioner's act of filleting the victim across his neck demonstrates a clear intent

6  to kill. The victim sustained a massive eight inch laceration across the neck area. Only the victim's

7  unusually corpulent physique prevented the knife from striking his jugular vein and carotid arteries

8  and assuring a fatal blow.

9      The state court determination was not contrary to, or an unreasonable application of, Federal

10  law as determined by the Supreme Court. 28 U.S.C. § 2254(d). The claim must be rejected.

11  **B.  Ground Two**

12      Petitioner next claims Dr. Malcolm offered improper expert opinion evidence when he

13  testified that Meeks' injury was of the type "you see in an execution-style slaying." (RT[4] 101.)

14  Petitioner argues the doctor's testimony embraced the ultimate issue and was used as evidence of

15  Petitioner's mental state. Petitioner further claims his counsel was ineffective in failing to object to

16  the testimony.

17      1.  Review of Claim by State Courts

18      Like the first claim, this claim was presented on direct appeal to the Fifth DCA and denied in

19  a reasoned opinion. (LD D at pp. 8-10.) Petitioner also raised it in his petition for review in the

20  California Supreme Court. (LD E.) The petition was denied on March 15, 2006. (LD F.) The

21  California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is

22  presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth

23  DCA.  Ylst, 501 U.S. at 803.

24      In rejecting this claim, the Fifth DCA determined that the doctor's statement was admissible,

25  as follows:

26          Dr. Malcolm's testimony was admissible if it was "[r]elated to a subject that is
           sufficiently beyond common experience that the opinion . . . would assist the trier of fact,"

27

28  _____
       [4]"RT" refers to the Reporter's Transcript on Appeal.

and it was '[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject . . . ." [Citation.] The testimony satisfied this criteria. The nature and severity of the victim's injury was sufficiently beyond common knowledge that an expert opinion on the matter would assist the jury. Further, Dr. Malcolm's opinion had a reasonable basis. Dr. Malcolm's testimony made clear his opinion that the victim's injury was like those seen in execution-style slayings was based on his experience observing and treating similar injuries and his knowledge garnered from 15 years' experience as an emergency room doctor, during which time he personally saw 150 to 250 cases involving knife-wound injuries. [Petitioner] has cited no support for his suggestion that only a criminalist would have sufficient expertise to offer an opinion as to the type of knife injury suffered by the victim.

We also reject [Petitioner's] suggestion that Dr. Malcolm's opinions impermissibly stated [Petitioner's] subjective intention. [Petitioner] argues that the doctor's description of the victim's wound was "an opinion regarding the defendant's state of mind because the use of the word 'execution-style' obviously meant that the person who cut the victim's neck did it with the intent to kill him." However, the mere fact that an expert opinion may encompass the ultimate issue of fact to be decided by the jury does not render the opinion inadmissible. [Citation.] An opinion of this kind may impermissibly invade the province of the jury if, for instance, it imputes subjective knowledge or intent to a defendant where there is no foundational evidence of that knowledge or intent, or it does "nothing more than inform the jury how [the expert] believe[s] the case should be decided." [Citation.] Here, there is no indication Dr. Malcolm was offering his opinion based on his subjective belief about how the case should be decided. Rather, Dr. Malcolm's opinion was based on the application of his firsthand experience and expertise to assessing the particular injuries sustained by the victim in this case. [Petitioner's] counsel properly refrained from objecting to admissible testimony. Consequently, his assistance was not ineffective.

(LD D at pp. 8-10.)

2.  Analysis of Claim

To the extent Petitioner seeks relief based on evidentiary error, Respondent correctly argues the claim as stated does not present a cognizable federal claim. Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 67, (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985).  In this case, Petitioner does not claim a violation of the Constitution or Federal law. His claim is based entirely on state law is therefore not cognizable on federal habeas. Estelle, 502 U.S. at 67 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). "[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990), quoting, Dugger v. Adams, 489

1  U.S. 401, 409 (1989). In addition, Federal courts are bound by state court rulings on questions of

2  state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942

3  (1989). Therefore the evidentiary challenge is not cognizable and must be dismissed. In addition, any

4  attempt to make out a federal claim would violate exhaustion requirements since the federal basis

5  was never presented to the state courts. 28 U.S.C. § 2254(b).

6          Even if Petitioner were to exhaust and present a federal basis for the claim, he would not be

7  entitled to relief.  There can only be habeas relief for the admission of prejudicial evidence if the

8  admission was fundamentally unfair and resulted in a denial of due process. Pulley v. Harris, 465

9  U.S. 37, 41, (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d

10  1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613

11  (9th Cir.1990).  Only if there are no permissible inferences that the jury may draw from the evidence

12  can its admission rise to the level of a due process violation. Jammal v. Van de Kamp, 926 F.2d 918,

13  920 (9th Cir. 1991).

14          In this case, the admission of this evidence clearly did not violate due process. Examining

15  physician Dr. Malcolm was board certified in advanced trauma, life support and emergency

16  medicine. (RT 98.) During the time he had spent working as an emergency room specialist, he had

17  seen approximately 150 to 250 knife-wound cases. (RT 99.) Based on this background, Dr.

18  Malcolm's assessment of the injury as one like those seen in execution-style slayings was certainly

19  fair. The characterization could not have prejudiced Petitioner because the statement was merely an

20  assessment of the type of injury. There is absolutely no indication that Dr. Malcolm offered this

21  statement as an opinion on how the case should be decided, and the comment offered nothing more

22  than what the jury would have concluded from the other evidence presented.

23          Petitioner's claim that defense counsel failed to object to Dr. Malcolm's statement is also

24  meritless. Ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which

25  exists "in order to protect the fundamental right to a fair trial." Strickland v. Washington, 466 U.S.

26  668, 684 (1984)). A claim for ineffective assistance must meet the two-part test advanced by the

27  Strickland court. First, Petitioner must show that counsel made errors so serious that counsel was not

28  functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Id. at 687. Second,

1    Petitioner must show that the deficient performance prejudiced the defense. Id. Here, the state courts

2    correctly applied the Strickland standard in rejecting the claim. The state court reasonably

3    determined that defense counsel could not be faulted for failing to object, because as discussed

4    above, the evidence was admissible. Defense counsel properly refrained from objecting, and any

5    objection would have been futile. This claim must also be rejected.

6        **C.  Ground Three**

7        In his last claim for relief, Petitioner alleges remarks made by Petitioner's ex-wife Denise

8    Meler prejudiced the defense. During cross-examination, the prosecutor inquired of Meler the date of

9    her separation from Petitioner. She responded:

10        I can't be positive exactly what date it was. [¶] Because he was in and out of jail all the time, and, you know, it was like we were together. And, I mean, he was locked up. He'd get out,
11        and he'd get locked up.

12    (RT 127.)

13        Petitioner's counsel immediately moved for a mistrial based on the ground that Meler's

14    testimony was inflammatory. The court denied the motion but admonished the witness to answer

15    only the questions put before her. The court then admonished the jury:

16        Okay. Ladies and gentlemen, one issue. This witness has asked when she and the defendant had separated. And in an attempt to answer that, she said the defendant had been in
17        jail. And that's inappropriate.

18        I think she's trying to tell you that she didn't know exactly when, based on this. I want to make sure the fact that a defendant - this defendant has been in jail, has no bearing,
19        whatsoever, as to his guilt or innocence on this case. And it is extremely important that you understand that and you abide by that.

20
21        Will anybody, as we sit here now, look at this case or this defendant differently because of that information?

22        I'm going to give you an admonition: Disregard that. It is irrelevant. It tends to be prejudicial so disregard that and do not let that enter into your discussions or deliberations in
23        any way, whatsoever.

24    (RT 130.)

25        1.  Review of Claim by State Courts

26        This claim was also presented on direct appeal and rejected in a reasoned opinion. (LD D at

27    pp. 10-12.) Likewise, it was raised in a petition for review to the California Supreme Court where it

28    was summarily denied. (LD E, F.) The California Supreme Court is presumed to have denied the

1  claim for the same reasons expressed by the Fifth DCA. <u>Ylst</u>, 501 U.S. at 803.

2       The Fifth DCA rejected this claim, finding Petitioner did not suffer any prejudice and any

3  error was harmless, as follows:

4       On appeal, defendant contends the court abused its discretion in denying his motion
        for a mistrial, and defense counsel rendered ineffective assistance by failing to raise
5       additional objections to Meler's testimony on constitutional grounds. Defendant argues
        Meler's statement that defendant was "in and out of jail all the time" constituted inadmissible
6       character evidence under Evidence Code 1101, and its admission violated his federal due
        process rights.

7
        Whether or not defendant's Evidence Code section 1101 and due process arguments
8       may have merit, we find Meler's testimony did not prejudice him. Since defendant himself
        testified about his criminal past, it is unlikely Meler's brief, nonresponsive testimony
9       referring to defendant serving jail time made any difference to the outcome of the trial.
        Moreover, the court admonished the jury to disregard completely Meler's testimony. The
10      "crucial assumption underlying our constitutional system of trial by jury is that jurors
        generally understand and faithfully follow instructions." [Citations.] Finally, the evidence
11      against defendant was overwhelming. Three eyewitnesses refuted defendant's claim he did
        not go to Meler's trailer the night of the attempted murder and burglary, and Meler's and
12      Meeks' testimony established defendant was the perpetrator of the crimes. On this record,
        under either the federal harmless error standard of review (<i>Chapman v. California</i> (1967) 386
13      U.S. 18, 24) or the state miscarriage of justice standard of review [Citation], we conclude the
        admission of Meler's testimony did not prejudice defendant, and therefore reversal based on
14      defendant's due process claims is not required.

15  (LD D at pp. 11-12.)

16      2.  Analysis of Claim

17      As noted above, in general, the admissibility of evidence is a matter of state law, and is not

18  reviewable in a federal habeas corpus proceeding. <u>Estelle</u>, 502 U.S. at 67.  Only if the admission of

19  prejudicial evidence was fundamentally unfair and resulted in a denial of due process will Petitioner

20  be entitled to relief, <u>Pulley</u>, 465 U.S. at 41; <u>Walters</u>, 45 F.3d at 1357; <u>Jeffries</u>, 5 F.3d at 1192;

21  <u>Gordon</u>, 895 F.2d at 613, and only if there are no permissible inferences that the jury may draw from

22  the evidence can its admission rise to the level of a due process violation. <u>Jammal</u>, 926 F.2d at 920.

23      In this case, Meler's statement did not rise to the level of a due process violation. To begin

24  with, the trial court specifically admonished the jury to disregard the statement, and jurors are

25  presumed to abide by such instructions from the court. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234

26  (2000). Next, Petitioner was not prejudiced by the comment because his criminal background was

27  made known to the jury when he took the stand. (RT 180-181, 183.) And finally, the evidence of

28  Petitioner's guilt was overwhelming. Petitioner's only defense was his alibi that he was not at the

1  trailer when the attack took place. However, three eyewitnesses placed him at the scene during the

2  incident, and two eyewitnesses testified that he was the perpetrator. Given this evidence, the state

3  court's determination that Meler's statement was harmless was objectively reasonable.

4      In addition, Petitioner's claim of ineffective assistance of counsel is meritless. Defense

5  counsel in fact did object to the statement and moved for a mistrial. (RT 127-129.) Therefore,

6  Petitioner has failed to show counsel erred pursuant to <u>Strickland</u>. 466 U.S. at 684. Petitioner also

7  fails to show prejudice because, as discussed above, the witness' comments were harmless. <u>Id</u>. Thus,

8  this claim must also be denied.

9  **IV.  Certificate of Appealability**

10      A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

11  district court's denial of his petition, and an appeal is only allowed in certain circumstances.  <u>Miller-</u>

12  <u>El v. Cockrell</u>, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue

13  a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

14      (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
district judge, the final order shall be subject to review, on appeal, by the court

15  of appeals for the circuit in which the proceeding is held.

16      (b) There shall be no right of appeal from a final order in a proceeding to test the
validity of a warrant to remove to another district or place for commitment or trial

17  a person charged with a criminal offense against the United States, or to test the
validity of such person's detention pending removal proceedings.

18

19  (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an
appeal may not be taken to the court of appeals from–

20      (A) the final order in a habeas corpus proceeding in which the
detention complained of arises out of process issued by a State

21  court; or

22      (B) the final order in a proceeding under section 2255.

23      (2) A certificate of appealability may issue under paragraph (1) only if the
applicant has made a substantial showing of the denial of a constitutional right.

24

25      (3) The certificate of appealability under paragraph (1) shall indicate which
specific issue or issues satisfy the showing required by paragraph (2).

26      If a court denies a petitioner's petition, the court may only issue a certificate of appealability

27  "if jurists of reason could disagree with the district court's resolution of his constitutional claims or

28  that jurists could conclude the issues presented are adequate to deserve encouragement to proceed

1  further." <u>Miller-El</u>, 123 S.Ct. at 1034; <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  While the

2  petitioner is not required to prove the merits of his case, he must demonstrate "something more than

3  the absence of frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 123 S.Ct. at

4  1040.

5       In the present case, the Court finds that reasonable jurists would not find the Court's

6  determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

7  deserving of encouragement to proceed further.  Petitioner has not made the required substantial

8  showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a

9  certificate of appealability.

10                                **ORDER**

11       Accordingly, IT IS HEREBY ORDERED:

12       1) The Petition for Writ of Habeas Corpus is DENIED WITH PREJUDICE;

13       2) The Clerk of Court is DIRECTED to enter judgment for Respondent; and

14       3) The Court DECLINES to issue a certificate of appealability.

15

16       IT IS SO ORDERED.

17   **Dated:   August 25, 2008**            **/s/ Gary S. Austin**
                                              UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26

27

28